IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
JENNIFER BROWN,              )
Administratrix for the       )
Estate of Larry Brown,       )
deceased,                    )
                             )
      Plaintiff,             )
                             )      CIVIL ACTION NO.
      v.                     )        2:21cv440-MHT
                             )            (WO)
JEFFERSON S. DUNN, Alabama   )
Prison Commissioner;         )
et al.,                      )
                             )
      Defendants.            )
```

OPINION AND ORDER

This case arises out of the tragic death of Larry
Brown.  Plaintiff Jennifer Brown, on behalf of decedent
Brown's estate, seeks to hold three prison officials
liable in their 'individual capacities' for decedent's
death: Jefferson S. Dunn, then the commissioner of the
Alabama Department of Corrections (ADOC); Patrice

Jones, an ADOC correctional warden; and David Lamar, another ADOC correctional warden.[1]

Plaintiff asserts two counts in her amended complaint against the officials. In Count 1, she claims that the three officials failed to protect decedent from a substantial risk of serious harm, in violation of the Eighth and Fourteenth Amendments, as enforced through 42 U.S.C. § 1983. And, in Count 2, she seeks to hold the three officials liable under Alabama's wrongful-death statute, again for their failure to protect decedent. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 1367 (supplemental).

Now pending before the court are two motions to dismiss: one filed by former Commissioner Dunn, and

---

1. Plaintiff also generally seeks to hold "unidentified and unnamed guards" liable. Third Am. Compl. (Doc. 50) ¶ 10. These fictitious defendants will be addressed in a separate order. Therefore, the terms defendant and defendants, when used in the instant order and opinion, refer to only named defendants Dunn, Jones, and Lamar.

another filed by Wardens Jones and Lamar. The three officials contend that sovereign immunity and qualified immunity bar plaintiff's claims. Jones and Lamar also argue that the amended complaint should be dismissed as an impermissible shotgun pleading. For the reasons set forth below, defendants' dismissal motions will be denied as to Count 1 and granted as to Count 2.

## I.  BACKGROUND

The facts alleged in the amended complaint, taken in the light most favorable to plaintiff, are as follows.

In 2016, the United States Department of Justice (DOJ) notified ADOC that it was investigating ADOC's male correctional facilities. After a three-year investigation, DOJ issued a report on the conditions in the male prisons in April 2019, and a supplemental report in July 2020 further detailing those conditions. The reports were specifically provided to ADOC

officials.

The 2019 and 2020 DOJ reports alleged that ADOC's male correctional facilities suffered from overcrowding, staffing shortages, and rampant inmate-on-inmate physical and sexual violence. The reports further alleged that the available data likely underestimate the extent of violence in ADOC facilities, as ADOC lacks a centralized system to track prisoner homicides across facilities and often misclassifies prisoner homicides as deaths precipitated by natural causes. The DOJ's reports also represent that there were other patterns of dangerous conditions across Alabama prisons including: insufficient security cameras and convex mirrors; lack of adequate supervision; failure to screen new inmates for contraband, including weapons, drugs, and cell phones; failure to control the manufacture and flow of weapons; failure to respond appropriately to reports of threats; failure to prevent extortion among prisoners; failure

4

to classify inmates by risk level and house them accordingly; failure to prevent uncontrolled movement of prisoners; failure to fix broken and defective locks; and failure to provide adequate programming.

Among the facilities investigated by DOJ was the Bullock Correctional Facility, where decedent Brown was incarcerated and where Jones and Lamar were wardens. At the time of decedent's death, Dunn was ADOC's highest policymaking official and had responsibility over the day-to-day operations at all Alabama prisons, including Bullock. In this capacity, Dunn received and reviewed incident reports describing inmate-on-inmate homicides.

Around the time of DOJ's investigation, Bullock was a medium-security facility designed to accommodate 919 inmates; had a staff vacancy rate of 60.1 %; and was operating at an occupancy rate of 140 %. At least five incidents of serious inmate-on-inmate violence were reported at Bullock in the years leading up to

decedent's death: a sexual and physical assault in January 2018, a homicide in February 2018, a stabbing in April 2018, a homicide in June 2020, and another homicide in November 2020. In at least two of those incidents, the victims previously reported that they were afraid they would be attacked by other inmates.

Furthermore, due to ineffective classification and pervasive misclassification of inmates, the prison routinely failed to separate violent prisoners from non-violent prisoners. Instead, officers at Bullock routinely placed inmates with histories of violence in "restricted housing" alongside other inmates, without those histories, including decedent.

In January 2021, decedent started receiving death threats from eight inmates (Charles David, Charles Andersen, Carlos Jackson, Edward Bowman, Marcus Washington, Marcus Jackson, "D.J.," and "Roach"), some or all of whom had histories of violence. Both decedent and other inmates notified several guards of

concerns over decedent's safety due to the threats from the eight inmates named, but the guards did not take any protective action. Three months later, in April 2021, one or more of those eight inmates physically assaulted decedent, and he died from injuries sustained during the attack.

## II. DISCUSSION

### A. Motion-to-Dismiss Standard

Defendants bring motions to dismiss under Subpart (b)(1) of Rule 12 of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction and under Subpart (b)(6) of that rule for failure to state a claim upon which relief can be granted. In considering a motion to dismiss, the court accepts plaintiff's factual allegations as true, *see Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and construes the complaint in plaintiff's favor, *see Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993).

B. Count 1: Plaintiff's Eighth Amendment Claim

As previously explained, in Count 1 plaintiff asserts an Eighth Amendment claim against each of the three defendants in their individual capacities. In response, defendants argue that the count should be dismissed pursuant to subparts (b)(1) and (b)(6) of Rule 12 because they are entitled to sovereign and qualified immunities.

1. Defendants' Sovereign Immunity Defense

The court begins with defendants' assertion that they are entitled to sovereign immunity under the Eleventh Amendment and Alabama law. In essence, they contend that the federal claim in Count 1 is, in actuality, an impermissible claim against the State of Alabama itself.

"[T]he Eleventh Amendment bars a damages action against a State in federal court," including "when

State officials are sued for damages in their official capacity." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). However, Eleventh Amendment immunity does not extend to individual-capacity suits against state officials under § 1983, *see Hafer v. Melo*, 502 U.S. 21, 30-31 (1991); it only applies when the State is the true party in interest, *see id.* The State is considered the true party in interest only if "the relief sought against the nominal defendant would in fact operate against the state, especially by imposing liability damages that must be paid out of the public [treasury]." *Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1577 (11th Cir. 1994). In other words, "Eleventh Amendment immunity applies only if the judgment *must*, under all circumstances, be paid out of state funds." *Id.* (emphasis in original).

Defendants do not represent that Alabama would be obligated to cover the costs of a judgment against them in their individual capacities. Because plaintiff

seeks damages against them personally and not from the state coffers, the Eleventh Amendment presents no bar to relief.

Alabama state-law sovereign immunity also does not bar plaintiff's ability to obtain relief. As an Alabama state court has correctly recognized, such immunity does not apply to federal claims like the one asserted here. *See King v. Corr. Med. Servs., Inc.*, 919 So. 2d 1186, 1191 (Ala. Civ. App. 2005).[2]

---

2. Defendants also contend that, because plaintiff can obtain damages otherwise barred by sovereign immunity by bringing her claim before the Alabama Board of Adjustment, sovereign immunity should bar her from recovering damages by suing the officials in their individual capacity. Defendants are mistaken. For one, this argument just begs the question of whether defendants are entitled to sovereign immunity in the first place, and, as already stated, they are not. *See Barefield v. Dunn*, 688 F. Supp. 3d 1026, 1060 (M.D. Ala. 2023) (Watkins, J.). Moreover, the existence of an alternative state forum does not entitle defendants to Eleventh Amendment immunity. *See Monroe v. Pape*, 365 U.S. 167, 183 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

2. Defendants' Qualified Immunity Defense

Having determined that defendants are not entitled to sovereign immunity from the federal claim in Count 1, this court turns to whether they are entitled to qualified immunity.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once officials establish that they were acting within their discretionary authority, which is uncontested here, the court engages in two distinct inquiries to determine if qualified immunity applies: (1) whether the plaintiff's allegations "make out a violation of a constitutional right," and (2) whether "the right at issue was clearly established at the time of the defendant's alleged misconduct." *Id.* at 232

11

(quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

There are three ways a plaintiff may demonstrate the law was clearly established. *See Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019). First, the plaintiff can "show that a materially similar case has already been decided." *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019). Second, the plaintiff can point to broad statements of legal principles that apply with "obvious clarity to the circumstances." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). Third, the plaintiff can prove that the conduct was "so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Id.* Over the years, materially similar cases and broad statements of legal principles have created a foundation of relevant clearly established Eighth Amendment law.

*a. Plaintiff Has Asserted Clearly Established Eighth Amendment Law in Count 1.* The Constitution does

12

not permit prison officials to turn a blind eye to violence to inmate-on-inmate violence. Rather, it mandates that officials "protect prisoners from violence inflicted upon them by other prisoners." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). However, not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Consequently, to establish that a prison official violated the Eighth Amendment's prohibition against cruel and unusual punishment, a plaintiff must prove that the official was deliberately indifferent "to a substantial risk of serious harm to an inmate who suffers injury." *Lane v. Philbin,* 835 F.3d 1302, 1307 (11th Cir. 2016). To do so, "a plaintiff must show '(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and

(3) causation.'" *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019). Deliberate indifference "has both a subjective and an objective component." *Id.* Subjectively, the official must be aware that his own conduct "put the plaintiff at substantial risk of serious harm." *Wade v. McDade*, 106 F.4th 1251, 1258 (11th Cir. 2024) (en banc). "Objectively, the official must have responded to the known risk in an unreasonable manner, in that he or she 'knew of ways to reduce the harm' but knowingly or recklessly declined to act." *Marbury*, 936 F.3d at 1233 (quoting *Rodriguez v. Sec'y for Dept. of Corr.*, 508 F.3d 611, 620 (11th Cir. 2007).

As plaintiff's claim here relies on supervisory liability, proving it becomes a bit more complicated. Section 1983, which is the basis for plaintiff's Eighth Amendment claim, does not make supervisors automatically liable for their subordinates' actions. *See Cottone v. Jenne*, 326 F.3d 1352, 1360

14

(11th Cir. 2003).     "Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation."  *Id.*

A plaintiff may establish supervisory liability for a § 1983 Eighth Amendment failure-to-protect claim in at least three ways.

First, a plaintiff may demonstrate that "the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so."  *Id.*  In this case, plaintiff has not alleged that defendants directed their subordinates to act unlawfully or failed to stop subordinates that defendants knew would act unlawfully.

Second, a plaintiff may demonstrate that "a 'history of widespread abuse' put[] the responsible supervisor on notice of the need to correct" the

asserted constitutional violation and that the supervisor failed to correct said violation. *Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006). Usually, to plead an Eighth Amendment claim, a plaintiff must establish that an official was deliberately indifferent to a specific threat the victim faced. Yet, in some cases officials may be liable for their deliberate indifference to "a generalized risk of violence" or history of widespread abuse. *See Marbury*, 936 F.3d at 1235.

Generally, to establish liability for history-of-widespread-abuse claim (also known as a generalized-risk-of-violence claim), a plaintiff must point "to specific features of a facility or its population" that render it particularly violent. *Id.* In other words, that those particular features "present an objectively substantial risk of serious harm." *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1029 (11th Cir. 2001) (en banc). Next, the plaintiff must

16

show that an official was deliberately indifferent. *See id.* Then, the plaintiff must explain how that official's deliberate indifference to those features caused the injury at issue. *See id.* Here, as explained in more detail later, plaintiff has adequately pled a generalized-risk-of-violence claim.

Third, a plaintiff may show "a supervisor's custom or policy results in deliberate indifference to constitutional rights." *Id.* In the amended complaint here, plaintiff asserts that defendants' customs or policies were deliberately indifferent to decedent's constitutional rights. *See, e.g.,* Third Am. Compl. (Doc. 50) ¶¶ 95, 118. However, as plaintiff has already adequately pled a generalized-risk-of-violence claim, the court need not decide whether her assertions would establish a custom or policy claim.

*b. Plaintiff Has Adequately Pled in Count 1 that Decedent's Clearly Established Constitutional Right Was*

17

*Violated.* Reading the amended complaint in the light most favorable to her, the court concludes that plaintiff has sufficiently asserted a generalized-risk-of-violence claim.

First, plaintiff alleges that decedent Brown faced a substantial risk of serious harm. She begins by asserting ADOC's male prisons had a history of widespread abuse. As set forth in the preceding background, she alleges that all of the facilities suffered from: overcrowding; staffing shortages; inadequate supervision; a failure to classify inmates by risk level and house them accordingly; the proliferation of contraband (including weapons, drugs, and cell phones); insufficient security equipment; and broken or defective locks. She asserts that, because of these conditions, there was rampant inmate-on-inmate physical and sexual violence across ADOC's male prisons. For example, in the fiscal-year prior to decedent's death, there were over 1,100

18

inmate-on-inmate assaults and at least 16 prisoners were killed by other prisoners.

Plaintiff further alleges that Bullock was part of this widespread abuse, and points to a variety of features that rendered the facility particularly violent. She describes how Bullock was physically deteriorating, as it had broken and defective locks, which allowed prisoners to often roam freely, and insufficient or broken security cameras and convex mirrors, which prevented guards from monitoring prisoners. She also contends that, even if Bullock was not deteriorating, guards would have been powerless to stop inmate misconduct, for over half (60.1 %) of the staff positions at Bullock were vacant, while at the same time, it was overcrowded with inmates at an occupancy rate of 140 %; and that lopsided ratio left too few guards to watch over too many prisoners.

Plaintiff submits that reckless and poorly implemented policies at Bullock exacerbated the danger.

Due to pervasive misclassification many inmates with histories of serious violence were not housed separately. And even if they had been properly classified, it would not have made much difference, as Bullock housed everyone in general population together and everyone in restrictive housing together, rather than separating "nonviolent inmates from violent inmates." *Marsh*, 268 F.3d at 1029.

In her amended complaint, plaintiff explains how the asserted facility deterioration, staffing shortages, overpopulation, inadequate treatment, and reckless policies at Bullock rendered it especially dangerous. Guards failed to screen new inmates for contraband, and as a result the facility was flooded with, weapons, drugs, and cell phones. Those weapons and drugs not imported would be manufactured at Bullock by prisoners inadequately supervised by short-staffed guards equipped with insufficient security cameras and convex mirrors. Guards then failed to control the flow

of those weapons, drugs, and cell phones, which readily made their way through doors secured with broken and defective locks, and into the hands of other prisoners.

The amended complaint represents that the conditions at Bullock did not just create a substantial risk of serious harm, they actually caused serious harm. Inmates used cell phones to extort other inmates and their families. Sexual and physical violence was commonplace, often involving the use of prevalent weapons. The complaint also provides two examples of homicides that occurred in the ten months leading to decedent's death. Moreover, plaintiff contends that the actual number of homicides during that time may be much higher, as Bullock routinely misclassifies prisoner deaths. This misclassification problem is in turn made worse by ADOC's lack of a centralized classification system for reporting prisoner deaths. For example, it is alleged that one of the two previously referenced homicides was unreported.

According to the amended complaint, the many alleged incidents of inmate-on-inmate violence that did not result in death, also faced reporting problems. As previously explained, in the fiscal-year prior to decedent Brown's death, there were over 1,100 inmate-on-inmate assaults in ADOC male prisons. What proportion of those assaults occurred at Bullock, the month-to-month breakdown of those assaults, and whether there are many other unreported assaults is unclear, in part, because of ADOC's own actions. In particular, ADOC curbed public reporting of serious inmate-on-inmate violence in the months after DOJ issued its first report. Moreover, ADOC does not have a grievance system to report when guards improperly respond to incidents or threats of inmate-on-inmate violence, which also makes proper reporting difficult.

Plaintiff asserts that staff at Bullock would fail to respond to these dangers. For example, she alleges that a few years before decedents' death, a third

prisoner was killed at Bullock, who just one day prior "expressed concern for his safety to prison officials." Third Am. Compl. (Doc. 50) ¶54. She also represents that staff at Bullock did not intervene at a different time when they were told a prisoner was "'kidnapped' by other prisoners and forcibly held ... for multiple days while [the] prisoner-captors extorted the hostage-prisoner's family and friends." *Id.* ¶¶56-57.

The Eleventh Circuit Court of Appeals has repeatedly found that features, like those plaintiff asserts occurred at Bullock, pose a substantial risk of serious harm. In *Marsh v. Butler County, Alabama,* the appellate court found that a jail that was overcrowded, failed to segregate violent inmates from non-violent inmates, failed to control the flow of weapons, and had inadequate supervision and defective locks, all posed an "objectively substantial risk of serious harm." 268 F.3d at 1029. The appellate court concluded the same in *Hale v. Tallapoosa County,* for a jail that was

overcrowded, failed to classify and separate violent inmates, and inadequately supervised inmates. *See* 50 F.3d 1579, 1583 (11th Cir. 1995). And more recently, in *Dickinson v. Cochran*, the Eleventh Circuit concluded that a facility that "routinely housed dangerous inmates in crowded conditions with non-violent inmates, allowed the introduction of contraband by improperly searching inmates, and inadequately supervised inmates" posed a substantial risk of serious harm. 833 F. App'x 268, 272 (11th Cir. 2020) (citations omitted).[3]

Second, plaintiff has adequately pled that defendants were deliberately indifferent to this substantial risk of serious harm. Defendants were subjectively aware that their conduct posed a substantial risk of serious harm to decedent Brown. According to the amended complaint, defendants were

---

3. While as an unpublished case *Dickinson* cannot be relied upon to define clearly established law," *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 (11th Cir. 2018), it is still persuasive for demonstrating how a court might apply law already clearly established.

notified of the history of widespread abuse at Bullock
by the DOJ reports, both of which were sent to the
officials. *See Dickinson*, 833 F. App'x at 270-73
(involving notice through a letter sent by DOJ); *Marsh*,
268 F.3d at 1029 (involving notice given, in part,
through reports on jail conditions and lawsuits).  The
DOJ reports provided illustrative (but not exhaustive)
examples of inmate-on-inmate violence and inmate access
to contraband at Bullock.  The reports also detailed
*patterns* of facility deterioration, staffing issues,
overcrowding, violence, and dangerous policies, across
*all* the prisons investigated.  As Bullock was one of
the prisons investigated and discussed by the DOJ, the
report provided notice of the conditions at Bullock.
*See Dickinson*, 833 F. App'x at 270-73.

Plaintiff has demonstrated that defendants'
responses were objectively unreasonable, as they
knowingly or recklessly failed to remedy the conditions
at Bullock.  The amended complaint asserts that Dunn,

as ADOC's highest policymaking official, and Jones and
Lamar, as wardens at Bullock, were responsible for the
conditions.  Yet, according to the complaint, in the
two years following DOJ's first report until decedent
was killed, defendants knew about the widespread abuse
at Bullock and failed to correct it.

Plaintiff contends that defendants failed to take
any action in response, and she offered many possible
actions they could have taken to remedy the conditions
at Bullock.   For example, changing the classification
and housing policies; remedying the staffing shortages
and overcrowding; fixing the broken, defective, or
inadequate locks, mirrors, and cameras; and
establishing a grievance system to report when guards
improperly respond to incidents or threats of
inmate-on-inmate.   Plaintiff's assertions, taken as
true and in the light most favorable to her, would
reflect that defendants were deliberately indifferent.
*See*, *e.g.*, *Hale*, 50 F.3d at 1584-85 (finding sheriff's

"failure to take meaningful action" to address overcrowding, inadequate supervision by guards, and violence among constituted deliberate indifference); *id.* at 1583-84 (stating sheriff's failure to pursue reasonable measures such as "classifying and segregating the inmates based on their likelihood for violence" was deliberately indifferent).

Finally, plaintiff has shown how defendants' deliberate indifference to the specific features at Bullock caused the decedent's death. Plaintiff asserts that decedent Brown was yet another victim of widespread abuse at Bullock. Decedent was housed at Bullock in restrictive housing. Plaintiff submits that pursuant to the previously discussed policies, rather than being housed separately, eight inmates with histories of violence were housed alongside decedent. In January 2021, those eight individuals threatened to kill decedent. Fearful for his life, decedent told the guards at Bullock about the death threats, and in doing

27

so he named the eight individuals responsible. The under-staffed and under-equipped guards did nothing in response. According to the amended complaint, for the next three months, decedent (and later other concerned inmates as well) continued to seek help from the guards at Bullock. The complaint states that help never came, and, as a result, in April 2021, decedent was attacked by the eight inmates. He died the following month from injuries caused by the attack.

Plaintiff alleges that, because of Bullock's improper classification policies, the eight inmates who threatened and attacked decedent, were not properly separated, and thus put in a position where they could attack decedent Brown. Inadequate staffing, overcrowding, defective locks, and insufficient or broken security cameras and convex mirrors made it particularly easy for those inmates to harm decedent, as guards were ill equipped to respond to any threats. And defendants' failure to implement a centralized

grievance system for improper responses to threats of violence made it harder to report the guards' failure to respond to the threats against decedent.

Nevertheless, defendants make several arguments for why plaintiff's allegations do not amount to a violation of clearly established law. Defendants begin by contending that plaintiff has not pointed to any specific features of Bullock that render it particularly violent. Defendants argue that plaintiff has made only "allegations of generalized violence spread out across all of ADOC's major male facilities over a number of years." Jones and Lamar Br. Supp. Mot. Dismiss (Doc. 54), at 8 (emphasis omitted).

While defendants are correct that plaintiff makes generalized allegations of violence across ADOC facilities, they misunderstand the function of those allegations. Plaintiff's systemic allegations are circumstantial background evidence of defendants' deliberate indifference to the conditions at Bullock.

*See Farmer*, 511 U.S. at 842, 843 n.8.  Moreover, as Bullock is one of the prisons that DOJ investigated and discussed as part of the patterns outlined in its report, these assertions, taken in the light most favorable to plaintiff, are assertions of the conditions at Bullock.  Furthermore, and contrary to defendants' contention, in addition to her systemic allegations plaintiff made specific allegations about the conditions at Bullock and the circumstances of decedent Brown's death.

Next, to argue that they did not violate clearly established law, defendants point to several Eleventh Circuit cases involving inmate-on-inmate violence, where the plaintiff did not meet the generalized-risk-of-violence standard.  Defendants chiefly rely on *Marbury v. Warden*, which involved a plaintiff who repeatedly asked to be transferred because he feared for his safety.  *See* 936 F.3d at 1231.  In his letters to the warden seeking a transfer,

plaintiff mentioned witnessing 15 stabbings in his cell block. *See id.* at 1231-32. After two months of being repeatedly denied a transfer, plaintiff was stabbed by another inmate. *Id.* Plaintiff sued the warden, asserting the warden had been put on notice of a history of widespread abuse (the 15 stabbings) and that the warden's deliberate indifference to those stabbings caused plaintiff to be stabbed. *See id.* at 1234-35. The Eleventh Circuit stated that the 15 stabbings, standing alone, were not sufficient to demonstrate the prison was one "where violence and terror reign." *Id.* at 1234. Defendants in this case correspondingly argue that because plaintiff gives only a few examples of violence at Bullock, she has not demonstrated that the facility was one where violence and terror reign.

Defendants misunderstand *Marbury*. *Marbury* does not establish that to prove a generalized-risk-of-violence claim, violence must be so commonplace that violence and terror reign. Rather, *Marbury*'s

violence-and-terror standard only "applies where a plaintiff alleges only a generalized risk and points to no 'specific features of a facility or its population rendering it particularly violent.'" *Dickinson*, 833 F. App'x at 275 (discussing *Marbury*, 936 F.3d at 1235). *Marbury* merely suggests that evidence of a reign of violence and terror would be one way to establish deliberate indifference; it is does not say it is the only way. When a plaintiff points to "specific features of [a facility] that render it particularly violent," *id.*, and thus "has alleged more than a generalized risk of violence," *id.*, the plaintiff does not need to prove a reign of terror and violence. *See id.*; *see also Marsh*, 268 F.3d at 1034 (finding that because of the dangerous conditions at the facility, defendant was deliberately indifferent even though "no serious injury was alleged to have [previously] occurred"). In such cases, the specific features help explain how a defendant's deliberate indifference

caused the injury.

Furthermore, defendants argue that other inmates, not defendants, proximately caused decedent death. Under Alabama law--which defines proximate cause in this case--the touchstone of proximate cause is whether the injury was a foreseeable consequence of defendants' actions. *See Williams v. Bennett*, 689 F.2d 1370, 1389 (11th Cir. 1982); *see also Alabama Power Co. v. Taylor*, 306 So. 2d 236, 249 (Ala. 1975). But, contrary to defendants' assertion proximate cause does not require a defendant's conduct to be the "sole cause" of plaintiff's injury, *see Bennett*, 689 F.2d at 1389. At bottom, what matters is foreseeability, not exclusivity.

Here, showing that defendants caused decedent's death requires plaintiff to prove two layers of causation: (1) that the prison conditions caused decedent's death and (2) that defendants caused those prison conditions. *See id.* at 1384-85. By meeting the

33

standard for a supervisory-liability Eighth Amendment claim, plaintiff has established proximate causation on both layers. *See LaMarca v. Turner*, 995 F.2d 1526, 1538-39 (11th Cir. 1993). In essence, finding that the conditions at Bullock violated the Eighth Amendment and that decedent was subject to those conditions, "presupposes the distinct likelihood" of decedent's injury. *Id.* at 1538. And demonstrating the causal link required for supervisory liability establishes that defendants proximately caused the conditions. *See id.*

Moreover, Jones and Lamar--but not Dunn--submit that previous caselaw is inapposite because it involves county jails rather than prisons. They contend that prisons are different from jails because prisons often house more dangerous individuals. Yet, whether a facility is labeled a prison or jail is not determinative of the risk posed by population housed within. *See Bell v. Wolfish*, 441 U.S. 520, 547 n.28-29

34

(1979).   A prison can be filled with tax offenders, while the jail next door is housing recently convicted mass murderers awaiting transfer to a maximum-security prison.  Consequently, the focus is properly on whether the conditions at a specific facility meet the requirements imposed by the Eighth Amendment, not whether a facility is of a certain type.  *See Marbury*, 936 F.3d at 1235.  *Compare LaMarca*, 995 F.2d at 1536-37 (finding that the conditions at a *prison* violated the Eighth Amendment), *with Hale*, 50 F.3d at 1584-85 (relying on *LaMarca* to find that the conditions at a *jail* violated the Eighth Amendment).

Jones and Lamar also contend that previous cases (*Marsh*, *Hale*, and *Dickinson*) are distinguishable because they involved a "*total* failure to classify and segregate violent and non-violent detainees," rather than an ineffective classification scheme or routine misclassification.  Jones and Lamar Br. Supp. Mot. Dismiss (Doc. 54), at 10 n.4 (emphasis in original).

This argument misunderstands the proper inquiry under the Eighth Amendment. The inquiry is not whether a classification scheme existed or not, but whether a particular classification scheme posed a substantial risk of serious harm to which defendants were deliberately indifferent. *See Dickinson*, 833 F. App'x at 269 (finding deliberate indifference when certain violent inmates were misclassified). And as already discussed, plaintiff has adequately pled such.

Dunn--but not Jones and Lamar--makes one final argument. Dunn argues that plaintiff has not cited to any case that proves a "statewide commissioner individually violates the Constitution every time any inmate in any correctional facility in the state assaults another inmate." Dunn Reply Br. (Doc. 63), at 5. But plaintiff is not asserting that a statewide commissioner is automatically liable for every act of inmate-on-inmate violence; rather, she is asserting that when a statewide commissioner's conduct violates

36

clearly established Eighth Amendment standards and satisfies the high bar for § 1983 supervisory liability, that commissioner is not entitled to qualified immunity. *See generally Williams v. Bennett*, 689 F.2d 1370 (11th Cir. 1982) (while the law before the court was somewhat different, this 1982 case provides a helpful discussion of when corrections officials at the highest level can be held liable in the individual capacities on an Eighth Amendment generalized-risk-of-violence claim).

Ultimately, when viewed in the light most favorable to her, plaintiff's allegations are sufficient to establish that defendants violated decedent's clearly established Eighth Amendment right.


### C. Count 2: Plaintiff's Wrongful-Death Claim

The court now turns to Count 2, in which plaintiff claims that defendants violated Alabama's wrongful-death statute. Under the

traditional-common-law rule, an injured party's personal tort claims abate upon their death. *See Robertson v. Wegmann*, 436 U.S. 584, 589 (1978). In other words, there is no survivorship under the traditional-common-law rule. *See id.* Unsatisfied with that harsh rule, Alabama passed a wrongful-death statute, which permits survivorship when a decedent's death is caused by "the wrongful act, omission, or negligence of any person, persons, or corporation," Ala. Code § 6-5-410(a). *See Simmons v. Pulmosan Safety Equip. Corp., Inc.*, 471 F. Supp. 999, 1001 (S.D. Ala. 1979) (Thomas., J.). Here, plaintiff contends that defendants' Eighth Amendment violation was a wrongful act or omission that caused decedent's death. While plaintiff asserts Count 2 as a separate count from Count 1, Count 2 is redundant, for it just reasserts the claim in Count 1.

To understand why Count 2 is redundant, it helps to provide some explanation as to why plaintiff may assert

38

Count 1, her § 1983 Eighth Amendment claim. The Eleventh Circuit has explained that "[b]y its terms, 42 U.S.C. § 1983 does not provide for the survival of civil rights actions." *Est. of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1045 (11th Cir. 2011). "Due to this 'deficiency' in the statute, the survivorship of civil rights actions is governed by 42 U.S.C. § 1988(a)." *Id.* Section 1988(a), "generally directs that, where federal law is 'deficient,' the state law of the forum applies," so long as said law is not inconsistent with federal law. *Id.*

Generally, "the applicable Alabama survivorship law is Ala. Code § 6-5-462," which requires that a decedent's unfiled tort claims abate upon their death. *Id.* at 1046 (cleaned up). If this survivorship statute were to apply, then decedent Brown's Eighth Amendment claim would not survive his death. *See id.*

However, "when a constitutional violation actually

causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful-death statute, Ala. Code § 6-5-410." *Id.* at 1047 (cleaned up). To permit otherwise would allow a state actor to "escape § 1983 liability by killing off the victim," thereby undermining the "deterrent purposes of the statute." *Id.* at 1048 n.10.

Here, as already discussed, defendants' constitutional violation allegedly proximately caused decedent's death; therefore plaintiff may use Alabama's wrongful-death statute to resolve the deficiency and resurrect decedent's § 1983 Eighth Amendment claim. *See id.* at 1047-48, 1047 n.9. In essence, she can claim that defendants' Eighth Amendment violation (Count 1), also violates the wrongful-death statute (Count 2), which contains a survivorship provision incorporated through § 1988(a), allowing plaintiff to assert decedent's § 1983 claim (Count 1). As plaintiff's § 1983 claim is based on a violation of the

wrongful-death statute, Count 2 is just repeating the claim in Count 1.[4]    Accordingly, Count 2 will be dismissed, albeit without prejudice, as redundant.


      D. Jones and Lamar's Shotgun-Pleading Assertion

Jones and Lamar--but not Dunn--contend that the complaint should be dismissed because it is an impermissible "shotgun pleading," in violation of Federal Rules of Civil Procedure 8(a)(2) and 10(b).  A complaint is a "shotgun pleading" when it presents claims in a manner where a defendant cannot "discern what [the plaintiff] is claiming and frame a responsive pleading."  *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1544 n.14 (11th Cir. 1985).  At bottom, the complaint "must give the defendants adequate notice of the claims against them and the grounds upon which each

---

4. Defendants also argue Count 2 is barred by § 14 immunity and state-agent immunity, but as this section explains, Count 2 just repeats Count 1.  And for the reasons already explained, § 14 immunity and state-agent immunity do not apply to Count 1.

claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).

The Eleventh Circuit has identified, at least, four categories of shotgun pleadings: first, "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint," *id.* at 1321; second, "a complaint ... replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action," *id.* at 1322; third, a complaint that fails to separate "each cause of action or claim for relief" into a different count, *id.* at 1323; and, fourth, a complaint that asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against," *id.* Wardens Jones and Lamar assert

42

that plaintiff's complaint falls into the first, second, and fourth categories.[5]

Jones and Lamar begin by contending that the complaint falls into the first category of shotgun pleading because "each of the two counts rely on exactly the same allegations." Jones and Lamar Br. Supp. Mot. Dismiss (Doc. 54), at 4. This argument misunderstands the first category, which is not *just* about repeating the same allegations; rather, it is about situations where both the general factual allegations *and* irrelevant allegations of each of the preceding counts are incorporated. *See Weiland*, 792

---

5. Jones and Lamar are inconsistent as to which category or categories of shotgun pleading the complaint falls into. They initially assert that only one category applies, then they assert three apply, and finally (in their reply brief) they assert--without explanation--that all four apply. *See* Jones and Lamar Br. Supp. Mot. Dismiss (Doc. 54), at 3 n.2; *id.* at 3-4; Jones and Lamar Reply Br. (Doc. 64), at 2. As arguments are made only with respect to the first, second, and fourth categories, the court will discuss only whether those categories are met. Regardless, the complaint does not fall into the third category of shotgun pleading.

F.3d at 1324.   In essence, the first category is attempting to address an issue where defendants would have "difficulty knowing what they were alleged to have done and why they were liable for doing it" because by incorporating all the preceding allegations plaintiff would also incorporate irrelevant or immaterial allegations. *Id.* Such a concern is inapplicable to the present case, because, as previously discussed, the reason plaintiff repeats the allegations is that she is repeating the same claim in two separate counts.   Thus, while Count 2 is due to be dismissed as redundant, this complaint is not the type meant to be covered by the first category of shotgun pleading as the assertions made are *relevant* to both counts.

As stated, Jones and Lamar further contend that the complaint fits into the second category of shotgun pleading.   As previously stated, this category involves "a complaint ... replete with conclusory, vague, and immaterial facts not obviously connected to any

44

particular cause of action." *Weiland*, 792 F.3d at 1322. The wardens argue that many of the complaint's assertions are either vague and conclusory or not specific to the Bullock facility or decedent's death. On the contrary, as explained above, the facts asserted in the complaint are concrete, detailed, and material to plaintiff's claims. While the complaint begins by outlining a history of alleged defects across all of ADOC's male prisons (which of course includes Bullock), it then goes on to discuss the specific conditions at Bullock, and the circumstances of decedent's death. And, as already explained, both the systemic allegations and the allegations specific to Bullock and decedent Brown's death help explain why defendants were deliberately indifferent. Both are necessary to explain Dunn's alleged liability for decedent's death at Bullock, and the systemic allegations are needed as background to the Bullock allegations to explain the wardens' alleged liability.

Finally, as stated, Jones and Lamar assert that plaintiff's complaint belongs in the fourth category. This category refers to complaints that assert "multiple claims against multiple defendants without specifying" who did what or who each claim is brought against. *Weiland*, 792 F.3d at 1323. Jones and Lamar contend that, after page 3, the complaint does not distinguish between the defendants, and instead only refers to Dunn, Jones, and Lamar as "Defendants" or names all three "in trio." Jones and Lamar Br. Supp. Mot. Dismiss (Doc. 54), at 4. This argument misconstrues the fourth category, which refers to cases where no specific defendants are named, not where all the defendants are explicitly named and, as explained above, the all allegations go to all defendants. At bottom, this contention is a factual dispute dressed up as a procedural one. In essence, Jones and Lamar are arguing that all three defendants did not have the same knowledge or take the same actions. But that goes to

46

the complaint's substance, not its form.

Comprehension, not perfection, is the standard of the pleading rules.  And, in this case, plaintiff's complaint is sufficiently comprehensible so as not to be a shotgun pleading.


### III. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss will be denied as to Count 1 and granted as to Count 2.  The court emphasizes that it has relied on only allegations in the third amended complaint. Whether the evidence actually supports those allegations is not before the court at this time. Moreover, because discovery has not yet begun, whether the evidence supports the conclusion that defendants were deliberately indifferent is also not before the court at this time.

***

Accordingly, it is ORDERED that:

47

(1) Defendant Jefferson Dunn's motion to dismiss (Doc. 51) and defendants Patrice Jones and David Lamar's motion to dismiss (Doc. 53) are denied as to Count 1.

(2) Said motions are granted as to Count 2, and said count is dismissed without prejudice.

DONE, this the 19th day of December, 2024.

    /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE